UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID L.,                              )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )        No.  4:21 CV 125 JMB
                                       )
                                       )
KILO KIJAKAZI,                         )
Commissioner of Social                 )
Social Security Administration,        )
                                       )
            Defendant.                 )

**MEMORANDUM AND ORDER**

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, et

seq. ("the Act").  The Act authorizes judicial review of the final decision of the Social Security

Administration denying Plaintiff David L.'s ("Plaintiff") application for disability benefits under

Title II of the Social Security Act,  see 42 U.S.C. §§ 401 et seq.  All matters are pending before

the undersigned United States Magistrate Judge with the consent of the parties, pursuant to 28

U.S.C. § 636(c).  Substantial evidence supports the Commissioner's decision, and therefore it is

affirmed.  See 42 U.S.C. § 405(g).

I.     **Procedural History**

On August 15, 2016, Plaintiff filed an application for disability benefits, arguing that his

disability began on October 30, 2015, as a result of chronic obstructive pulmonary disease

("COPD"), obstructive sleep apnea, low back pain, hearing impairment, degenerative arthritis, and

hypertension.  (Tr. 245-51)  After Plaintiff's claims were denied upon initial consideration, he

requested a hearing before an ALJ.  Plaintiff appeared at the initial hearing (with counsel) on

August 22, 2018, and testified concerning the nature of his disability, his functional limitations,

1

and his past work.  (Tr. 34-66)  The ALJ also heard testimony from James Israel, a vocational expert ("VE").  (Tr. 59-65, 416-17)  The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on February 19, 2019, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 107-114)

Plaintiff sought review of the ALJ's decision before the Appeals Council.  The Appeals Council remanded this case for a further hearing and directed the ALJ "to provide further clarification as to the noise intensity level that [Plaintiff] could be exposed to in the workplace; and to consider the impact of [Plaintiff's] pulmonary rehabilitation sessions on [Plaintiff's] ability to perform work on a full-time basis."  (Tr. 15, 119-22)

On June 9, 2020, Plaintiff appeared (with counsel), and testified concerning the nature of his disability, his functional limitations, and his past work.  (Tr. 67-90)  The ALJ also heard testimony from VE Susan Shea.  (Tr. 85-89, 438-39)  The VE opined as to Plaintiff's ability to perform his past relevant work and to secure other work in the national economy, based upon Plaintiff's functional limitations, age, and education.  (Id.)  After considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on June 17, 2020, finding that Plaintiff was not disabled, and therefore denying benefits. (Tr. 20-25)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration.  (Tr. 1-6)  On December 4, 2020, the Appeals Council denied review of Plaintiff's claims, making the June 17, 2020, decision of the ALJ the final decision of the

Commissioner.  Plaintiff has therefore exhausted his administrative remedies, and his appeal is properly before this Court.  See 42 U.S.C. § 405(g).

As explained below, the Court has considered the entire record in this matter.  Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.  Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's treatment from March 7, 2013, through March 13, 2020.  The Court has considered the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.  SSM Health St. Joseph Hospital – St. Charles (Tr. 755-89, 907-1335)

From January 5, 2016 to January 17, 2019, Plaintiff received treatment at St. Joseph Hospital – St. Charles for his COPD and completed thirty-six pulmonary rehabilitation sessions.

A January 5, 2016, pulmonary function test showed mild to moderate obstructive airways disease associated with increase airway resistance.

On January 15, 2016, Plaintiff completed the 6 Minute Walk Test, and the staff member noted that he had tolerated the walk well.  Between January 15 and April 11, 2016, Plaintiff returned to pulmonary rehabilitation.  Dr. Kahn ordered a total of thirty-six sessions of thirty to sixty minutes of pulmonary rehabilitation and light training with free weights three times a week. In an April 11, 2016, final report, a staff member noted that Plaintiff had tolerated the sessions very well and had increased his exercise endurance from twenty-six to fifty-nine minutes.  The staff member further noted that Plaintiff would continue the maintenance program three days a week.

A January 10, 2017, pulmonary function test showed mild large airway with severe small

3

airway obstructive disease.

A January 8, 2018, pulmonary function test showed mild-to-moderate obstructive airways disease without significant reversibility and associated with increased airway resistance.

A January 17, 2019, CT of Plaintiff's chest showed no significant abnormalities.

**B.**    **Sitarski Chiropractic – Dr. Christopher Sitarski** (Tr. 449-462, 651-749, 852-69)

Between April 15, 2016, through October 23, 2018, Dr. Christopher Sitarski treated Plaintiff's low back pain.

On April 15, 2016, Dr. Sitarski completed a new patient examination.  An April 15, 2016, x-ray revealed degenerative changes and slight retrolisthesis at L4-L5.  Dr. Sitarski's diagnosis included dysfunction and disc degeneration of lumbar region, dysfunction of sacral region, and back muscle spasms.  Dr. Sitarski applied trigger point therapy to Plaintiff's thoracic, lumbar, and gluteal back regions and advised him to avoid lifting weights and to ice the area every two hours for fifteen minutes.  Plaintiff reported performing light exercise on a regular basis, including aerobics.  An x-ray showed degenerative changes to Plaintiff's spine with slight retrolisthesis.  In follow-up treatment on April 18, 2016, Plaintiff reported feeling slightly better and improvement with his pain when he had a massage.  Dr. Sitarski applied ten minutes of trigger point therapy. During treatment on April 20 and 22, 2016, Plaintiff reported feeling slightly better.  Dr. Sitarski applied ten minutes of trigger point therapy.  On April 27, 2016, Plaintiff reported having a flare up that morning but after pulmonary rehabilitation, he felt better.  Dr. Sitarski made specific chiropractic adjustments over all misalignments and ten minutes of trigger point therapy.

In follow-up treatment on May 4, 2016, Plaintiff reported doing better.  Dr. Sitarski made specific chiropractic adjustments and applied ten minutes of trigger point therapy.

During treatment on November 4, 8, and 11, 2016, Plaintiff reported having increased back

pain with walking and sitting.  Dr. Sitarski applied ten minutes of trigger point therapy.

On December 2 and 6, 2016, Plaintiff reported increased soreness in his low back.  Dr. Sitarski made specific chiropractic adjustments over all misalignments and ten minutes of trigger point therapy.  Plaintiff reported slight improvement of his low back pain on December 9, 2016, but on December 13, 2016, Plaintiff reported having to take Tramadol to alleviate his pain.  Dr. Sitarski applied ten minutes of trigger point therapy.  On December 20 and 27, 2016, Plaintiff reported improvement with some spasms, and his symptoms relieved by massages, resting, walking, and taking a warm bath.

During treatment on October 2, 2017, Plaintiff reported soreness in his back after riding his bike.  Dr. Sitarski applied fifteen minutes of electrical therapy and ten minutes of trigger point therapy.  On October 6, 10, 17, 20, and 24, 2017, Plaintiff reported doing a little to slightly better but he could barely complete a four-hour workday.  Dr. Sitarski applied electrical and trigger point therapy.  Plaintiff returned on October 31, 2017, and reported doing better.  Dr. Sitarski applied electrical and trigger point therapy.

In follow-up treatment on December 1, 2017, Plaintiff reported feeling worse after completing rehabilitation.  Dr. Sitarski applied electrical and trigger point therapy.

On February 15, 2018, Plaintiff reported being a passenger in a rear-end collision.  During treatment on February 16, 2018, Plaintiff reported additional injury to his lower back caused by a car accident.  Examination showed moderate spasms to Plaintiff's lower back.  Dr. Sitarski applied electrical and trigger point therapy and instructed Plaintiff to ice his lower back.

On February 27 and March 2, 2018, Plaintiff reported soreness in his lower back doing housework.  Dr. Sitarski applied electrical and trigger point therapy.  On March 6, 2018, Plaintiff reported a little improvement with relief lasting three days before the pain returned.  Plaintiff

returned on March 13, 16, and 23, 2018, and reported soreness in his lower back after traveling to Knoxville in a car.  Dr. Sitarski applied electrical and trigger point therapy.  On March 27 and 30, and April 3 and 6, 2018, Plaintiff reported feeling slightly better but nothing seemed to alleviate his back pain.  Dr. Sitarski applied electrical and trigger point therapy.

On April 10 and 13, 2018, Plaintiff reported lower back soreness.  In follow-up visits on April 17 and 20, 2018, Plaintiff reported feeling better and ready to start the exercises Dr. Sitarski had suggested.  Dr. Sitarski made specific chiropractic adjustments and applied electric and trigger point therapy and instructed to perform the exercises daily.  In follow-up treatment on April 24 and 27, 2018, Plaintiff reported trying some of the exercises but doing so resulted in soreness.  Dr. Sitarski applied electrical and trigger point therapy.

During treatment on May 1, 2018, Plaintiff reported feeling better and the exercises were going well.  On May 8 and 15, 2018, Plaintiff reported doing well but nothing relieved his back pain.  Dr. Sitarski applied electrical and trigger point therapy.  During follow-up treatment on May 22, 2018, Plaintiff reported having a flare up over the weekend but on May 29, 2018, he reported feeling better and ready to try the next level of exercises.  Dr. Sitarski applied electrical and trigger point therapy and explained how to perform the new exercises.  On June 5, 2018, Plaintiff reported feeling better and the exercises were helping his lower back pain.

On June 15 and 26, 2018, Plaintiff reported having some mild back spasms with medication providing some relief.  Dr. Sitarski applied electrical and trigger point therapy.  During treatment on July 10 and 31, 2018, Plaintiff reported doing all of the exercises as directed on a regular basis.  Plaintiff returned for treatment on August 14 and 28, 2018, and reported doing his normal routine had caused him pain.  Dr. Sitarski applied electrical and trigger point therapy.  On September 11, 2018, Plaintiff reported feeling better, and he had not missed any work due to his pain and doing

his exercises on a regular basis.  During treatment on October 2 and 23, 2018, Plaintiff reported doing pretty good with no setbacks and doing all of the exercises as directed on a regular basis. Dr. Sitarski applied electrical and trigger point therapy.

     **C.**    **Connect Hearing** (Tr. 536-38, 619-27, 794-851)

On July 18, 2016, through March 13, 2020, Plaintiff received treatment at Connect Hearing.  During treatment, Plaintiff reported experiencing difficulty with background noises and being on disability.

     **D.**    **SSM Healthcare Medical Group – Drs. Ahmareen Khan and Daniel Kramer** (Tr. 541-77, 628-50, 750-93, 870-906)

Between November 9, 2015, through March 13, 2020, Drs. Ahmareen Khan, Plaintiff's COPD specialist, and Daniel Kramer, his primary care physician, treated Plaintiff at SSM Healthcare.

On November 9, 2015, Plaintiff presented to establish care for further management of his recently diagnosed COPD and evaluation of his shortness of breath.  Plaintiff reported that a spirometry showed severe obstructive airways disease and having dyspnea and intermittent chest tightness.  Examination showed normal chest wall and respirations and no increased work of breathing.

On December 15, 2015, Plaintiff presented to establish care with Dr. Kramer and reported that he was doing reasonably well with respect to his COPD.  Dr. Kramer encouraged Plaintiff to lose weight and exercise.

A December 2, 2015, CT lung screening showed extensive pleural thickening and calcifications likely as a result of prior infection  and/or hemorrhage.  Dr. Kahn recommended a follow-up, low-dose screening in one year.

A January 6, 2016, pulmonary function report showed mild to moderate obstructive

airways disease associated with increased airway resistance.  On January 12, 2016, Dr. Khan referred Plaintiff for Phase 2 pulmonary rehabilitation.

During treatment on January 17, 2016, Dr, Kahn found Plaintiff's COPD to be stable and referred him for pulmonary rehabilitation.  On April 12, 2016, Plaintiff reported being compliant with pulmonary rehabilitation and noticing a difference following the two months of exercise in his ability to perform activities.  In follow-up treatment on July 14, 2016, a physical examination of Plaintiff's chest showed equal expansion with good effort and normal percussion.  Dr. Kahn continued Plaintiff's medication regimen and pulmonary rehabilitation.

A December 5, 2016, CT of Plaintiff's chest showed stable, extensive pleural calcifications, stable pulmonary nodules, and no significant emphysema.

During pulmonary follow-up on January 17, 2017, Dr. Kahn's examination showed equal expansion of his chest with good effort, percussion to be normal, and auscultation decreased bilaterally.  On July 18, 2017, Plaintiff reported being stable with no complaints of shortness of breath at rest, chest pain, chest tightness, wheezing, or a new respiratory infection.  Dr. Kahn continued Plaintiff's medication regimen.

During his annual physical examination on September 29, 2017, Dr. Kramer found Plaintiff's chest was clear to auscultation and symmetric air entry with no wheezes, rales, or rhonchi.

A January 8, 2018, CT of Plaintiff's chest showed no significant emphysema and no pulmonary nodules of concern, and no adenopathy.  On January 18, 2018, Plaintiff reported not having any chest pain, chest tightness, wheezing, or new upper respiratory infection.  A pulmonary function test showed stable mild to moderate obstructive airways disease.  Dr. Kahn's examination showed equal expansion of his chest with good effort, percussion to be normal, and auscultation

decreased bilaterally.  Dr. Kahn recommended that Plaintiff continue his medication regimen and pulmonary rehabilitation.

During treatment on July 19, 2018, Dr. Kahn found Plaintiff to be stable.  Plaintiff denied having any chest pain or tightness, shortness of breath, or any new upper respiratory infection and continued to exercise with pulmonary rehabilitation.

During routine treatment on September 28, 2018, Dr. Kramer's chest examination showed his lungs were clear to auscultation and symmetric air entry with no wheezes, rales, or rhonchi.  During follow-up treatment on July 24, 2019, Plaintiff reported having a recent diagnosis of pneumonia.  Dr. Kramer's chest examination the same results, and he diagnosed Plaintiff with a lower respiratory infection.

In pulmonary follow-up treatment on January 24, 2019, Plaintiff denied having any complaints of worsening shortness of breath, chest pain or tightness, or wheezing and reported being compliant with pulmonary rehabilitation.  Dr. Kahn's chest examination showed equal expansion and normal percussion.  Dr. Kahn instructed Plaintiff to continue pulmonary rehabilitation.  In a January 24, 2019, Letter of Medical Necessity, Dr. Kahn indicated that Plaintiff would need to participate in lifelong pulmonary rehabilitation.  On July 25, 2019, Dr. Kahn noted that Plaintiff had been stable since his last visit and his follow-up chest x-ray showed almost complete clearing of infiltrates.  Plaintiff denied having any chest pain or tightness, wheezing, or shortness of breath, or any new upper respiratory infection.  Plaintiff reported completing the prescribed antibiotics and steroids as treatment for bilateral pneumonia.  Dr. Kahn's chest examination showed equal expansion with good effort and normal percussion.

On January 30, 2020, Plaintiff returned for pulmonary follow up and reported having been Stable.  Plaintiff denied having any complaints of worsening of shortness of breath, chest pain, or

any tightness, or wheezing.

During treatment on March 13, 2020, Dr. Kramer noted that Plaintiff was doing well and would continue to work with pulmonary specialist and attend pulmonary rehabilitation regularly. Dr. Kramer's chest examination showed his lungs were clear to auscultation and symmetric air entry with no wheezes, rales, or rhonchi.

      **E.**      <u>**Drs. Siroth Charnond and Paul Vatterott's Treatment Notes**</u> (Tr.463-535, 580-601)

Between March 7, 2013, through November 16, 2015, Drs. Siroth Charnond and Paul Vatterott treated Plaintiff.

On March 7, 2013, Plaintiff presented to establish as a new patient.  Plaintiff reported that he exercised twice a week, worked in his garden, and enjoyed reading.  A respiratory examination showed a regular pattern with symmetrical movements and no distress.  In follow-up treatment on July 9, 2013, Plaintiff returned for his annual physical.  Dr. Vatterott noted that Plaintiff eats too much ice cream and drinks too much beer and instructed him to stop smoking.  A spirometry showed Plaintiff had severe COPD.  On January 21, 2014, Plaintiff presented with a cough. Respiratory examination showed no inspiratory or expiratory wheezes, no crackles/rales and decreased breath sounds.  Plaintiff reported that he had a spirometry malfunction during his testing on July 9, 2013, and, as a result, his results might be inaccurate.  During treatment on February 3, 2014, the physician assistant found that Plaintiff needed to repeat a spirometry because of an inaccurate reading not consistent with severe COPD.

Plaintiff returned on August 12, 2014, for his annual physical.  Plaintiff reported using his Ventolin three to four times a day to relieve his wheezing from COPD.  Respiratory examination showed his chest to be proportionate with symmetrical movements and no respiratory distress but he had expiratory wheezes.  Dr. Vatterott noted that Plaintiff's COPD was not well controlled, and

he had persistent wheezing and frequently used Ventolin.  On October 6, 2014, Plaintiff returned for treatment after he injured his hand.  Plaintiff reported smoking one to two packages of cigarettes each week.

Plaintiff returned for a medication refill on January 19, 2015.  Plaintiff reported taking Spiriva and, as a result, he rarely used his rescue inhalers.  The nurse practitioner found his COPD to be well controlled on Spiriva.  In follow-up treatment on May 15, 2015, Plaintiff presented with possible bronchitis.  Dr. Charnond's respiratory examination showed a regular respiratory pattern with symmetrical movements and lungs clear to auscultation.  Plaintiff returned on July 24, 2015, and reported that his breathing had improved with the addition of Breo and taking Spiriva every day and not using his albuterol inhaler for a couple of months.  Dr. Charnond found Plaintiff's COPD had improved and continued his medication regimen.  In a follow-up visit on November 16, 2015, Plaintiff presented with short-term disability forms to be completed based on his diagnosis of COPD.  Dr. Charnond's examination revealed decreased breath sounds.  Dr. Charnond found Plaintiff's COPD had been doing well since the addition of his rescue inhaler but over the last couple of months, Plaintiff has been using his Ventolin one to two times a day.  Plaintiff reported smoking cessation in fall 2014.

**F.    Consultative Internal Medicine Examination – Dr. Alan Spivack** (Tr. 602-15)

On January 18, 2017, Dr. Alan Spivack completed a consultative internal medicine examination.  Plaintiff reported COPD, hypertension, hyperlipidemia, sleep apnea, decreased hearing, and arthritis as his chief complaints.  Plaintiff indicated that he could walk one block and climb stairs slowly.  Dr. Spivack found that his pulmonary studies indicated probable restriction.

**G.    Miracle Ear Audiogram** (Tr. 616-18)

The audiogram on November 21, 2016, showed mild hearing loss.

11

Plaintiff reported his occupation as disabled.  NP Bonita Hill observed Plaintiff walking without restrictions.  Plaintiff presented for a blood pressure check.  Plaintiff reported not having any anxiety or depression.  In follow-up treatment on December 12 2018, Plaintiff reported trying to stop smoking but his attempts had failed each time.  NP Hill observed Plaintiff  had a normal gait.

### H.    Audiologic Evaluation – Dr. Colleen Basler (Tr. 1336-40)

On September 17, 2018, Dr. Colleen Basler performed an audiologic evaluation.  Plaintiff returned on October 2, 2018, and Dr. Basler found that the pure tone audiometric demonstrated a bilateral mild to moderate hearing loss.  After discussing treatment options, Plaintiff decided to wait before trying amplification.

### III.    The Hearing Before the ALJ

The ALJ conducted a telephone hearing on June 9, 2020.  Plaintiff participated in the telephone hearing with an attorney and testified at the hearing.  The VE also testified at the telephone hearing.  (Tr. 67-89)  At the beginning of the hearing, Plaintiff's counsel reported that the record was complete.  (Id. at 72)  The ALJ noted that Plaintiff has been engaged as a social service aide since the alleged onset date but not at substantial gainful activity ("SGA") levels.[1]  (Id. at 73)

### A.    Plaintiff's Testimony

Plaintiff testified that he has bachelor and master's degrees of science.  (Id. at 75)  Plaintiff

---

[1] Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that he has demonstrated the ability to engage in SGA.  See 20 C.F.R. §§ 404.1574, 404.1575.  If an individual engages in SGA, he is not disabled regardless of how severe his physical or mental impairment are and regardless of his age, education, and work experience.  20 C.F.R. §§ 404.1571, 416.971.  If an individual is not engaging in SGA, the analysis proceeds to the second step.  Id.

explained he lost weight, and his current weight fluctuates between 163 to 167 pounds.  (Id. at 86)

Plaintiff acknowledged that he completed a formalized pulmonary rehabilitation program in April 2016, and his insurance reimbursed him for this initial phase of the program.  (Id. at 75) Upon arrival, a nurse checked his blood pressure, pulse and other vital signs.  Plaintiff first completed a warm-up procedure, including stretching, and then walked on a treadmill for one hour, and used an arm bike for ten minutes.  (Id. at 80-81)  He finished his routine by using the free weights for fifteen to twenty minutes, and if time permitted, he used the aerodyne bike for fifteen to twenty minutes.  (Id. at 80, 83)  While Plaintiff completed the procedures with specified, progressive goals, such as a six-minute walk test, the nurse carefully monitored his pulse rate and watched to make sure he did not experience any medical problems.  (Id. at 77)  Thereafter, Plaintiff moved onto the maintenance phase of pulmonary rehabilitation, requiring  two hour sessions, three times a week; and his doctor expects he would require this maintenance pulmonary rehabilitation for the rest of his life.  (Id. at 76)

Plaintiff continued his maintenance program at DePaul, consistent with his pulmonologist's recommendation.  (Id. at 76-77, 79)  Plaintiff testified that his maintenance program was not as formalized as the initial program.  (Id. at 79)  Plaintiff testified that he completed his maintenance program before work on Mondays and Wednesdays, and later on Fridays because he did not work on Fridays.  Plaintiff testified that he could complete his rehabilitation program during normal facility hours, Monday through Friday, with no appointment required.  (Id. at 79-80, 84)  Plaintiff explained that he worked part-time Monday through Thursday from 10:00 a.m. to 2:00 p.m.  (Id. at 83)

**B.    The VE's Testimony**

The VE identified Plaintiff's past work as a collection clerk, a sedentary exertional job,

and a special vocational preparation and a security guard, both a light exertional jobs.  (Id. at 74)

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, education, work experience, and specific functional limitations would be able to perform a light weight job.  First, the ALJ asked  the VE to assume a hypothetical individual with the capacity to occasionally climb ramps/stairs; avoid concentrated exposure to the extremes of heat and cold, humidity, pulmonary irritants, and excessive vibration; and avoid all exposure to workplace hazards such as occupational control of moving machinery and unprotected heights. (Id. at 86)  The VE responded that such a hypothetical person would be able to perform Plaintiff's past work as a security guard and an account collections individual.  (Id.)

Next, the ALJ asked to assume the same hypothetical individual, except that his work demand would be reduced to sedentary with a three noise intensity level.  (Id. at 86-87)  The VE responded such individual could perform Plaintiff's past work as a collection clerk.  (Id. at 87)

The VE explained that if an individual is absent two or more days per month on an ongoing basis, such individual would be terminated from a job.  Counsel asked if the individual was late three days a week, even five minutes, would that affect his ability to maintain a job.  (Id. at 88) The VE indicated that such individual would not likely last beyond the thirty-day probationary period.  (Id. at 88-89)

**IV.   The ALJ's Decision**

In a decision dated June 17, 2020, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 16-26)  The ALJ found that, although the record shows Plaintiff had worked part-time since the alleged onset date with earnings at or above the level of SGA for at least part of the relevant time period, there was a period of at least twelve continuous months in

14

which Plaintiff was not engaged is SGA and, accordingly, the ALJ declined to make a finding of nondisability at this step.  (Id. at 19)

The ALJ determined that Plaintiff had severe impairments of degenerative disc disease and COPD.  (Id. at 20)  The ALJ determined that Plaintiff had a residual functional capacity ("RFC") to perform sedentary work with the following modifications:  (1) he can never climb ladders, ropes, or scaffolds; (2) he can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; (3) he must avoid all concentrated exposure to heat and cold, humidity, pulmonary irritants, and excessive vibration; (4) he must avoid all exposure to work place hazards such as occupational control of moving machinery and unprotected heights; and (5) his work environment must be limited to noise intensity level three.  (Id. at 20-24)

The ALJ found that recent treatment records showed improvement in Plaintiff's pulmonary functioning.  (Id. at 23)  In particular, at his follow-up appointment in January 2019, Dr. Khan noted that Plaintiff's recent PFT showed improvement in his FEV1 compared to one year earlier, and Plaintiff denied having any shortness of breath, chest pain, wheezing, or headaches, only a productive morning cough.  Dr. Khan recommended that Plaintiff continue pulmonary rehabilitation.  (Id.)

The ALJ considered Plaintiff's activities of daily living including caring for pets, performing light household tasks, and shopping in stores.  (Id. at 24)  The ALJ noted Plaintiff's extensive exercise at pulmonary rehabilitation, including one hour on a treadmill, lifting weights, and riding an exercise bike.  The ALJ opined that Plaintiff's "current employment strongly and directly impacts his allegations of disabling impairments."  (Id.)

The ALJ identified that Plaintiff's past relevant work as a collection clerk and a security guard.  The ALJ found, based on the VE's testimony, that Plaintiff could not perform his past

relevant work as a security guard but he could perform his past relevant work as a collection clerk. (Id. at 25)  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.  (Id. at 26)

The ALJ's decision is discussed in additional detail below.

## V.    **Standard of Review and Legal Framework**

"To be eligible for … benefits, [Plaintiff] must prove that [he] is disabled …." Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if [his] physical or mental impairment or impairments are of such severity that [he] is not only unable to do [her] previous work but cannot, considering [his] age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) [he] was severely impaired; (3) [his] impairment was, or was comparable to, a listed impairment; (4) [he] could perform past relevant work; and if not, (5) whether [he] could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

16

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration."  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision."  Id.  Specifically, in reviewing the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.     The credibility findings made by the ALJ.

2.     The claimant's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of the claimant's impairments.

6.     The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

17

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. <u>Buckner v. Astrue</u>, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. <u>Id</u>.; <u>see</u> <u>also</u> <u>McNamara v. Astrue</u>, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## VI.    Analysis of Issues Presented

In his brief to this Court, Plaintiff raises the following points of error:

1.      The ALJ's finding that Plaintiff engaged in substantial gainful activity in 2016 and 2017 is not supported by substantial evidence in the record; and

2.      The ALJ's RFC determination failed to include an accommodation for his need to attend pulmonary rehabilitation for two hours, three time a week.

### A.      The ALJ's Determination of Substantial Gainful Activity

Plaintiff challenges the ALJ's determination that he engaged in substantial gainful activity ("SGA") in 2016 and 2017.

As noted above, the Social Security regulations require the ALJ to follow a sequential procedure in analyzing disability claims. At the first step, the ALJ must determine whether the claimant is engaged in substantial gainful activity. Substantial gainful activity is work that is both substantial and gainful. Substantial work activity is work that involves doing significant physical or mental activities. Gainful work activity is work activity that one does for pay or profit, whether or not profit is realized. <u>See</u> 20 C.F.R. § 404.1572. If the ALJ finds a claimant is engaged in SGA,

18

then the claimant must be found not disabled regardless of the medical condition, age, education, or work experience.  See 20 C.F.R. § 404.1520(b).

Although the ALJ made a finding that Plaintiff worked above the level of SGA in 2016 and 2017, making Plaintiff ineligible for benefits up through that time, the ALJ concluded that, since the evidence supported a 12-month period in which Plaintiff was not engaged in SGA, he "decline[d] to make a finding of nondisability at this step."  (Tr. 18-19)

This Court need not decide whether Plaintiff engaged in substantial gainful activity because the ALJ explicitly considered "the entire period from the alleged onset date through the date of the decision."  (Tr. 19)  Any error is immaterial and has not prejudiced Plaintiff as the alleged onset date through the date of last insured encompasses the years 2016 and 2017.  Therefore, any error regarding Plaintiff's SGA was harmless, because the ALJ explicitly found Plaintiff was not disabled from his alleged onset date through the date of his decision – including the challenged 2016 and 2017 time periods.  See Van Vickle v. Astrue, 539 F.3d 825, 830 (8th Cir. 2008) ("There is no indication that the ALJ would have decided differently … and any error by the ALJ was therefore harmless.").

Plaintiff argues that the ALJ's finding that he was capable of engaging in substantial gainful activity in 2016 and 2017 "likely influenced the ALJ's later finding that Plaintiff was capable of full-time work" that can accommodate his pulmonary rehabilitation appointments.  This argument is speculative.  Nevertheless, Plaintiff does not show that the alleged error was so pervasive and harmful that, but for the error, the ALJ's decision would have been different.  See Shineski v. Sanders, 556 U.S. 396, 409-10 (2009).  Further, the record is clear that the ALJ was fully aware of Plaintiff's schedule and the availability of pulmonary rehabilitation services.  Accordingly, this Court cannot find reversible error flowing from the ALJ's comments regarding Plaintiff's SGA.

Plaintiff cannot prove he was harmed, and the ALJ's decision would be different had the alleged error not occurred.  See Id. (finding "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted'"); Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012).

      B.    **RFC Determination**

Plaintiff argues that the ALJ's RFC determination that he can perform his past work or any other work on a regular and continuing basis for five days each week, eight hours a day is not supported by substantial evidence.  In particular, he contends that the ALJ  failed to consider his need to attend pulmonary rehabilitation three times a week, for two hours each session.  In support, Plaintiff cites to the VE's testimony regarding how an individual would be terminated if he were late to work three days a week, even if only five minutes late each day.  (Tr. 88-89)

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations.  See 20 C.F.R. § 404.1545.  "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)).  An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  See Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment.").  The ALJ must explain his assessment of the RFC with specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily

activities, observations)" in describing how the evidence supports each conclusion).  Throughout

this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the

claimant.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Disability is not determined by

the presence of impairments, but by the effect the impairments have on the individual's ability to

perform substantial gainful activity.  20 C.F.R. §§ 404.1545(e), 416.945(e).

"It is the claimant's burden, and not the Social Security Commissioner's burden, to prove

the claimant's RFC."  Pearsall, 274 F.3d at 1217.  Because a claimant's RFC is a medical question,

an ALJ's assessment of it must be supported by substantial medical evidence that Plaintiff could

perform the requirements of competitive work without having his pain result in impermissible

levels of off-task behavior such as lying down and absenteeism.  See Lauer v. Apfel, 245 F.3d 700,

704 (8th Cir. 2001).

Here, the ALJ found that Plaintiff had the RFC to perform sedentary[2] work, with additional

enumerated limitations.  The ALJ found as follows:

> At the remand hearing, [Plaintiff's] testimony focused primarily on his pulmonary
> rehabilitation program.  [Plaintiff] testified that he went to pulmonary rehabilitation
> three times a week, for two hours per session.  [Plaintiff] testified that his current
> program is not as formalized as the structured program that he went to in the past.
> He indicated that he does not need to schedule an appointment for his rehabilitation,
> rather he can walk-in any time that the facility is open.  [Plaintiff] testified that the
> facility is open from 6:00 a.m. to 2:00 p.m. Monday through Friday.  [Plaintiff]
> testified that he generally goes on Mondays and Wednesdays at 6:00 a.m. before
> work, and later in the mornings on Friday, as he does not work on Fridays.  He
> testified that when he arrives he checks in with the nurse for his vitals and then
> begins his exercise routine independently.  According to [Plaintiff], that routine
> consists of warm up activities, about an hour on the treadmill, with an incline, arm
> bike, free weights, and an airdyne bike (time permitting)….

…

---

[2] A limitation to sedentary work is itself a significant limitation.  See, e.g., Ellis v. Barnhart, 392
F.3d 988, 994 (8th Cir. 2005) (explaining that sedentary work is itself a significant limitation,
showing the ALJ assigned some weight to the claimant's physician's opinion).

[Plaintiff] argued that he would not be able to work full-time or alternatively that he would be late to work several times per week because of his pulmonary rehabilitation program; however, the record does not support these allegations. Social Security Rulings provide that a residual functional capacity must be sustainable eight hours per day, five days per week or an equivalent schedule. SSR 96-8p. [Plaintiff] testified that he was able to complete his pulmonary rehabilitation based upon his own personal and work schedule, within the parameters of the facility's operating schedule, on a walk-in basis. It should be noted this is not a formalized program with set appointments, goals or other parameters similar to the formalized program he completed in 2016. [Plaintiff] testified that the operating hours of the facility that he used were from 6:00 a.m. to 2:00 p.m. [Plaintiff] testified that he worked four days per week, going in before work two of his working days. [Plaintiff] was able to work around his schedule two days per week to accommodate this rehabilitation. He provided no credible explanation as to why he could not accommodate that schedule three days per week assuming that he worked a full-time schedule, five days per week schedule. Further, while [Plaintiff] alleged that he would be late to work three or more days per week, he again provided no explanation as to why he would be unable to accommodate this schedule around his working hours, as he is currently able to do. Therefore, the undersigned finds that [Plaintiff] has not provided persuasive evidence to support his claim of absenteeism including arriving to work late/leaving early, or additional breaks.

(Tr. 22, 24)

Substantial evidence supports the ALJ's decision regarding Plaintiff's ability to perform his past work, as outlined in the decision. The Court agrees with the ALJ's findings in his decision and finds the ALJ did not err in failing to find Plaintiff unable to perform his past work or any other work in the national economy. As stated earlier, Plaintiff bears the burden to prove his RFC, Pearsall, 274 F.3d at 1217, and he has not shown that his pulmonary rehabilitation sessions would require him to be tardy three times a week. Plaintiff relies on the frequency of his pulmonary rehabilitation sessions to predict his future tardiness from work, but he has offered no evidence that this was a reliable predictor and no proof as to the number of days that he must be tardy due to his sessions. Nor did Plaintiff cite to any evidence in the record to suggest that he could not schedule his pulmonary rehabilitation sessions around his work schedule. See, e.g., Miller v. Berryhill, 2017 WL 3642035, at *7 (E.D. Mo. Aug. 24, 2017). Though Plaintiff's pulmonary

rehabilitation sessions are medically necessary with a lifelong duration, the record also reflects improvement of his impairments following treatment.  And importantly, his current sessions are not as formalized as his prior structured program, and he has not shown that there are no other sessions available at other times that would accommodate a work schedule.

Other courts in our Circuit have rejected similar arguments that medical treatment would result in unreasonable absenteeism and tardiness.  See, e.g., Greenwade v Saul, 2020 WL 1318793, at * 6 (N.D. Iowa Mar. 20, 2020) (collecting cases).   See also, Swink v. Saul, 931 F.3d 765, 769 (8th Cir. 2019) (RFC assessment excluding absenteeism was supported by substantial evidence, including objective medical evidence, treatment notes, and opinion evidence indicating that claimant's impairments would not cause frequent absences.).  Although Plaintiff testified to attending multiple weekly pulmonary rehabilitation sessions at the time of the hearing, "medical appointments do not necessarily have to be scheduled during work hours or require the claimant to miss an entire day of work."  Id.  Plaintiff has failed to demonstrate that his sessions could not be arranged to accommodate a full-time competitive employment schedule.

Plaintiff also suggests that the VE's testimony that an individual would be terminated if he were late to work three days per week, even as little as five minutes late each day, demonstrated his medical need for pulmonary rehabilitation three times a week prevents him from working full-time.  This argument, however, rests on the speculative conclusion that Plaintiff could not arrange his rehabilitation schedule around a normal work schedule.  See, e.g., Jeffries v. Berryhill, 2017 WL 365439, at *7 (E.D. Mo. Jan. 25, 2017) ("[E]ven if Plaintiff is right at a theoretical level that an employee cannot miss more than seven days of work in a year, Plaintiff did not show that her doctor's appointment require her to miss seven entire days of work per year[.]").

Because the ALJ based his RFC assessment upon review of all the credible, relevant

evidence of record, and the RFC is supported by some medical evidence, it will not be disturbed. See Baldwin v. Barnhart, 349 F.3d 549, 558 (8th Cir. 2003). See also Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005) ("An administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."). The ALJ's determination of Plaintiff's physical RFC is based upon a thorough review of the record as a whole. The RFC is consistent with substantial medical evidence of record and other objective evidence.

**VII.   Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001). "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion. Id. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016). For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole. See Finch, 547 F.3d at 935. Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case. See Buckner, 646 F.3d at 556. For the reasons set forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 3rd day of May, 2022

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE